USD⸴   ⸴Y
DO⸴    ⸴T
ELE⸴   ⸴⸴⸴ALLY FILED
DO⸴
DATE FILED: 3|14|12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LEONARD SCOTT,

                       Plaintiff,

            - against -

MICHAEL J. ASTRUE, Commissioner, Social
Security Administration,

                      Defendant.

**REPORT AND
RECOMMENDATION**

**10 Civ. 9481 (JGK) (RLE)**

To the HONORABLE JOHN G. KOELTL, U.S.D.J.:

## I. INTRODUCTION

Plaintiff Leonard Scott commenced this action under the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for disability benefits. On June 10, 2011, Scott moved for judgment on the pleadings, asking the Court 1) to find that he is disabled for less than sedentary work, and 2) to remand the case either for the calculation of benefits or for additional medical testimony and evidence to be gathered. Commissioner Astrue cross-moved for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure on July 22, 2011. Scott argues that the administrative law judge ("ALJ") committed several errors in considering the medical evidence presented, and that the ALJ's decision was not supported by substantial evidence. For the reasons that follow, I recommend that Scott's motion be **GRANTED**, the Government's motion be **DENIED**, and that the case be **REMANDED** for the ALJ to explain his reasoning with regard to Scott's treating physicians' opinions and how Scott's substance use was purportedly a contributing factor in his disability determination.

## II. BACKGROUND

**A.    Procedural History**

Scott applied for disability insurance benefits on May 22, 2008, based on his physical

conditions, including diabetes, diabetic neuropathy, gout, depression and chest pain.  Compl. ¶ 7.

He was denied benefits and requested a hearing before an ALJ.  Scott appeared at his hearing

with counsel on December 2, 2009, and testified before ALJ David Nisnewitz.  *Id.* at ¶¶ 8-9.

The ALJ issued a "Notice of Decision – Partially Favorable" on January 22, 2010, denied Scott

disability benefits and declared him not disabled.  *Id.* at ¶ 11.  Scott filed an administrative

appeal with the Commissioner's Appeal Council on February 16, 2010 (Req. for Rev. of Hearing

Dec.), but the Appeals Council denied review on October 19, 2010, making the ALJ's

determination final.  This action was filed by Scott on December 21, 2010.

**B.    ALJ Hearing and Decision**

**1.    Scott's Testimony at ALJ Hearing**

Scott was born on May 6, 1959.  Admin. Record ("A.R.") at 34.  He received his GED

and went to a vocational school, Sulbro Institute, in the Bronx.  *Id.* at 34-5.  He last worked in

November 2007 providing valet parking services at Williamsbridge Pasta Pasta restaurant.  A. R.

at 35-6.  He had to stop working after a year and a half because of the nerve damage in his hands

and feet due to neuropathy caused by his diabetic condition.  *Id.* at 36.  Scott has been diabetic

since 1995 and takes "two sets of insulin and metformin." *Id.* at 37.            Scott began

using drugs, particularly cocaine and crack, around 2002 as he struggled with personal issues.

A.R. 39.  He had been clean without drug use for ten months and was living in a therapeutic

community house at the time of the hearing.  *Id.* at 41.  Scott stated he had stopped using all

drugs in February 2009.  He had been receiving psychiatric care through a program called

2

"Jiggetts," *id*. at 42, 47, which he first attended on December 1, 2009. *Id*. at 48. Scott also had home attendants for almost a year to help care for his neuropathy. *Id*. After losing his apartment, he went to a number of hospitals for treatment and perhaps temporary shelter. *Id*. at 43.

Scott has chest pains periodically and takes nitroglycerin pills every couple of weeks when his chest starts hurting. A.R. 45. His neuropathy condition only allows him to walk about a block and a half on a warm day before he has to stop and rest to relieve the "electrical shocks in [his] feet." *Id*. at 46. He can walk at most for an hour, including periodic stops to rest and sit down. *Id*. He can carry twenty-five pounds with both hands over a short distance within a room. *Id*. at 47. Scott can no longer perform construction work as he once did because the nerves in his hand react whenever he picks up a hammer and "bang[s] it a couple [of] times." A.R. 49. He suffers from pain in his back, legs and feet. *Id*. at 54. He cannot sit for longer than forty-five minutes because of the pain in his legs. He experiences sensations of needles and pins being inserted into his feet, hands and groin. *Id*. To alleviate the pain associated with the neuropathy, Scott takes 3600 milligrams of gabapentin. The pain makes it hard for him to concentrate and he often becomes irritable with others. *Id*. at 55-56.

## 2.     Medical Evidence Submitted

*Saint Vincent's Hospital*

Scott's medical record begins with treatment at Saint Vincent's Hospital in Westchester in 2007. He was admitted on January 2, 2007, and released almost a month later on January 30, 2007. A. R. 163 (St. Vincent Hospital Med. Rec.). The ALJ's decision noted that Scott started using cocaine to seek relief from his neuropathic pain when his medications were not sufficient. *Id*. According to the decision, Scott's girlfriend at the time reported that he had attempted to

3

apply for disability benefits before this suit was brought but was unable to make his scheduled appointment because of severe leg pain. *Id.* Diana Pascual examined Scott and found he had a history of diabetes and peripheral neuropathy "which is quite painful." *Id.* at 166. Scott missed some of the group activities at Saint Vincent because of his foot pain, but reported that it felt better by the time he was discharged. He was released with approximately eight prescription drugs to be taken. *Id.*

*St. Luke's-Roosevelt Hospital*

At St. Luke's Roosevelt Hospital, Dr. Wasserman noted on February 5, 2007, that Scott had been referred from the Pain Clinic because of "severe pain that did not allow him to walk and so he was sent to the [emergency room]." *Id.* at 190. The attending physician in the Department of Neurology at St. Luke's-Roosevelt, Dr. Eugene Pak, noted on February 6, 2007, that Scott complained of an excruciating burning sensation in his hands and feet as well as his drug use. *Id.* On February 8, Scott received an EMG which found very mild sensory neuropathy. A. R. 171 (St. Luke's-Roosevelt Med. Rec.).

*Determination of Disability*

On July 14, 2008, Scott filled out a determination of disability form, detailing his symptoms and conditions. A.R. at 128. Scott noted that his daily activities were severely limited due to his diagnoses of diabetes, neuropathy and depression. He stated he used a cane and glasses. *Id.* at 134. Scott also stated that he could only walk for two blocks before needing to stop and rest for approximately twenty minutes. *Id.* Scott said that his pain began in 2006 and often felt like a stabbing pain, making his veins throb. *Id.* at 137. The pain occurred daily and could last for hours at a time.

4

*New York State Office of Temporary and Disability Assistance*

Scott was assessed by the New York State Office of Temporary and Disability Assistance (OTDA) on July 31, 2008. A. R. 199. The report from that office included records of Scott receiving treatment on June 22, 2008, at Weller Hospital in the Bronx for complaints of numbness in his extremities. *Id.* at 204. In addition, the report states that Scott arrived at the hospital complaining of chest pain. While Scott was in the hospital, other conditions related to diabetes were found. *Id.* at 227.

*Industrial Medicine Associates*

Scott received an internal medical examination by Dr. Sharon Revan at Industrial Medicine Associates, P.C. in the Bronx on July 23, 2008. A. R. at 254. Dr. Revan noted that Scott had gout and suffered from pain in his hands and feet from the neuropathy which is a result of his diabetes. Scott complained at that time that his hands and feet hurt when he walked one or two blocks. His feet hurt when he dressed himself and when he performed domestic chores. *Id.* at 255. Dr. Revan noted that Scott was unable to walk on his heels or toes because of the pain though he could sit and squat without problem. *Id.* Scott stated that he could lose his balance when standing and had to catch his breath if he was climbing eight stairs. He was taking thirteen different medications to treat his various ailments. *Id.* at 254-55. Dr. Revan's concluded that Scott suffered from gout, neuropathy, and diabetes, but that any limitations as a result of his condition were mild. *Id.* at 257.

Scott returned to Industrial Medicine Associates on August 13, 2008, and received a consultative psychiatric evaluation by Dr. Dmitri Bougavkov. Dr. Bougakov's evaluation noted multiple complaints, including loss of appetite and interest, mood swings, difficulty sleeping, social withdrawal, and lowered energy. A. R. at 258. Scott reported that he had been using

5

cocaine until approximately one and a half years prior to the evaluation date.  Dr. Bougakov reported that Scott's motor behavior was lethargic but otherwise appeared sufficiently groomed. *Id.* at 259.  He also noted that Scott's short-term memory skills were mildly impaired, which could have been related to distress caused by the pain he was experiencing.  *Id.* at 260.  Scott was reported to be able to complete most daily activities when he was not in pain.  Ultimately, Dr. Bougakov concluded that Scott suffered from psychiatric symptomatology and adjustment disorder with depressed mood, but it was not severe enough to interrupt his daily activities.  On September 24, 2008, a psychiatric review technique of Scott was recorded, noting that while Scott's daily activities were not restricted by his psychiatric diagnosis, he did have some difficulties in maintaining social functioning and even greater challenges in maintaining his concentration.  A. R. at 272.

A Physical Residual Functional Capacity Assessment, completed by an individual named "I. Blood[1]," on September 24, 2008, noted that Scott's exertional limitations included a twenty pound limit for occasional lifting and carrying, and a ten pound limit for frequent lifting and carrying.  A. R. at 277.  According to the assessment, Scott could still sit, stand and/or walk for periods of six hours, with normal breaks, in an eight-hour workday.  The conclusions reached were based on Scott's alleged poor compliance with his medication regime, observations of Scott's ability to move and rise from a chair without difficulty (albeit complaining of pain in his feet), and his hand and grip strength remaining in tact.  The report concluded that Scott's lower legs and fingers had decreased sensation to pinpricks, and that Scott "does not retain the

---

[1]. Blood appears to be a lay disability examiner from the record.  In the Disability Determination Transmittal, he is listed as such.  It's unclear whether he is actually the state agency medical consultant.  *See* Pl's Mot. 19.

functional capacity for prior work." *Id.* Instead, Scott's current functional capacity was for a "full range of light." *Id.* Additionally, the report found that while Scott reported pain and numbness in his hands and feet—both of which are supported by the medical evidence—it wasn't severe enough to interfere with his daily activities. *Id.* at 280.

The Mental Residual Functional Capacity Assessment was also conducted and the conclusion was that Scott had mild to moderate issues concerning memory retention, social interaction, sustained concentration and adaptation. A. R. at 282-83. Ultimately, the report concluded that Scott did not suffer from mental illness or symptoms that would overwhelm his ability to carry out daily tasks or interfere in a substantial way with his daily activities. *Id.* at 284.

*Dr. Patricia Thenor*, *Treating Physician*

In an additional medical evaluation on December 3, 2008, A. R. at 287, Dr. Patricia Thenor noted that she had been attending Scott each month for six months and that he had "very painful legs with burning and tingling from feet to knees and hands and wrists" and walked with a cane. *Id.* She added that these conditions could continue for over a year and that psychological and emotional conditions affected Scott's symptoms. *Id.* Dr. Thenor also noted that Scott's pain was severe enough to prohibit him from walking more than one block without rest or severe pain and to interfere with his attention and concentration in performing even simple work tasks. *Id.* at 288.

Dr. Thenor noted that Scott could only sit for a maximum of forty-five minutes and stand for a maximum of fifteen minutes in an eight-hour working day. *Id.* According to Dr. Thenor, Scott needed to be able to walk approximately every five minutes for about one minute. *Id.* Because of Scott's need for constant shifting in positions, she recommended that he be placed in

7

a job where he would be allowed to shift his positions at will from sitting, standing and walking, as well as the ability to take unscheduled breaks about four or five times daily, resting for approximately fifteen to thirty minutes prior to returning to work. *Id.* at 289. If Scott were performing work standing up, Dr. Thenor recommended he use a cane. Dr. Thenor's evaluation of Scott was that his "residual functional capacity [was] consistent with less than sedentary work." A. R. at 16 (Social Security Administration, Office of Disability Adjudication and Review, Decision by ALJ David Z. Nisnewitz, January 22, 1010). Dr. Thenor noted that Scott could not lift or carry ten pounds or more. She noted other physical limitations Scott had with bending or squatting, and that he had significant limitations in performing repetitive activities. *Id.* He could rarely, if ever, reach his arms overhead. As a result of Scott's impairments, Dr. Thenor estimated that he would be missing at least four days a month from his prospective work. She did note, however, that he was capable of "low stress jobs." *Id.* at 288. Lastly, Dr. Thenor stated that Scott "has severe and painful neuropathy. His pain is intermittent, unpredictable and currently not controlled." *Id.* at 290.

### *Dr. Karamchand Rameshwar, Treating Physician*

Dr. Rameshwar began treating Scott on May 19, 2009, and submitted a residual functional capacity assessment on November 20, 2009, although the report itself is undated. A. R. at 346-47; Pl's Mot. 10, 23. His report indicated that Scott experienced moderate to severe limitations in his ability to interact frequently with others and to perform repetitive, varied tasks. Dr. Rameshwar noted that Scott's mood disorder and depression were influenced by his chronic medical illnesses, namely his diabetes and resulting neuropathy, high blood pressure and angina. Pl's Mot. 10.

8

*Chest Pains, January - March 2009*

Scott went to Weiler Hospital in the Bronx by ambulance on January 9, 2009. His discharge evaluation on January 14, 2009, indicated acute coronary syndrome. A. R. at 292. He was treated by Dr. Shawn Samuel. Dr. Samuel noted for the record Scott's neuropathic pain, depression and diabetic condition, as well as his substance abuse. *Id.* On February 19, 2009, Scott visited Bronx Lebanon Hospital, complaining of chest pain, where he had a Cardiac Perfusion Imaging performed, A. R. at 305, and it appears from the record that the result of the test was abnormal.[2]

On March 16, 2009, Scott visited Bellevue Hospital complaining of chest pain. A. R. at 291. The attending physician, Dr. Sapana Shah, reported that Scott's last cocaine use was one to three weeks before the date of the report, March 18, 2009. Dr. Shah noted that while Scott's chest pain had diminished, he continued to have severe pain in his hands and legs, including numbness and tingling. *Id.*

*Damian Family Care Center*

On May 12, 2009, laboratory tests were conducted on Scott by Heather Colby, RPA, at the Damian Family Care Center in Queens, New York. A. R. at 313. Colby found that Scott was taking the maximum amount of neurontin for his neuropathic pain in his hands and legs. *Id.* He was scheduled to start taking injections of vitamin B12 to aid in combating his neuropathic pain and to increase his reliance on neurotonin. *Id.* at 315. Over the next few days, Scott had a colonoscopy and received treatment for signs of hypoglycemia. *Id.* at 317, 319. He had low blood sugar on May 14, 2009. He received injections of B12 at the Center on a regular basis

---

[2]While the test results do not clearly indicate "normal," the Bellevue report references a stress test from a few weeks earlier in which the results were noted as abnormal. *See* A. R. at 310.

over the next couple of weeks.  On May 19, 2009, Scott also received an initial psychiatric

examination at the Center for his depression. *Id.* at 321.

On August 14, 2009, Scott returned to the Damian Family Care Center, complaining of

lower abdominal pain and stating that his neuropathy pain was at its worse.  *Id.* at 331.  He was

given a B12 injection and scheduled for an appointment with a podiatrist to assess the

neuropathy in his feet.  His abdomen was found to be normal.  While at the Center, he was given

at least fifteen medications to continue with as part of his treatment upon his discharge.  *Id.* at

333-34.  On September 17, 2009, Scott returned to the Center and was diagnosed with

gastroenteritis.  *Id.* at 341.

Registered Physician Assistant Heather Colby assessed Scott's ability to do work-related

activities on October 14, 2009.  She found that Scott could lift only up to twenty-five pounds on

occasion.  A. R. at 343. She noted that he could only stand and/or walk for a maximum of one

hour in an eight-hour workday due to his symptoms.  *Id.*  Similarly, Scott could only sit for a

maximum of one hour (in an eight-hour day) without interruption.  *Id.* at 344.  Colby also noted

that Scott could not climb or crawl, but that he could occasionally stoop, kneel, crouch or

balance.  *Id.*  His ability to reach, handle, push, pull or feel was limited by his neuropathy.  *Id.*

Lastly, Scott was limited in his capacity to carry out work-related activities where environmental

factors or functions such as moving machinery, fumes, humidity, vibration and heights were

present.  *Id.* at 345.

On what appears from the record to be November 20, 2009, Dr. Karamchand Rameshwar

completed a survey regarding Scott's residual functional capacity based on a psychiatric

examination.  A. R. at 346.  Dr. Rameshwar noted that Scott's restriction on social daily

activities was mild, but his ability to engage in his personal interests was "moderately

10

severe[ly]" restricted based on his symptoms. A. R. at 132. While he was able to perform simple tasks and to follow instructions, Scott would be "moderately severe[ly]" impaired in work that required frequent interaction with others or complex tasks. *Id.* at 129. Dr. Rameshwar finally noted that Scott's ability to secure full-time work was moderately affected by his chronic conditions of diabetes, neuropathy, high blood pressure, and angina. *Id.*

### 3. ALJ's Decision

ALJ Nisnewitz issued a decision on January 22, 2010, denying Scott disability benefits under § 1614(a)(3)(A) of the Social Security Act. A. R. at 11. The ALJ found that Scott suffered from a disability, but that his substance abuse was a contributing factor to his condition, making him ineligible under the SSA to receive benefits. *Id.* According to the ALJ, no combination of his impairments satisfied the listed impairments in 20 C.F.R. § 416.920(d). *Id.* He found that Scott's mental impairments do not meet listings 12.04 or 12.09. The ALJ also concluded that Scott had not engaged in substantial gainful activity since May 22, 2008, the date he applied for disability benefits. *Id.* at 13.

In making his determination, the ALJ relied, in part, on the EMG administered to Scott on February 6, 2007, which seemed to show mild sensory neuropathy and recent substance use. *Id.* at 15. The ALJ stated that he accorded significant weight to the medical opinions of Dr. Sharon Revan and Dr. Dmitri Bougakov, who conducted physical and mental examinations of Scott, respectively. *Id.* at 18. In contrast, he did not accord substantive weight to the findings of Dr. Patricia Thenor and Dr. Karamchand Rameshwar, stating that their findings were not supported by objective evidence. *Id.* No weight was given to the opinion of Ms. Heather Colby. *Id.*

The ALJ did acknowledge that Scott's disabled status more than minimally impairs his

11

ability to perform basic work functions, constituting severe impairments, *id.* at 4, but that Scott could still perform work "less than the full range of light work" under 20 C.F.R. § 416.697(b) given that he determined Scott could lift up to twenty pounds occasionally and ten pounds frequently. He also determined from the record that Scott could walk, sit, or stand for six hours out of an eight-hour workday. *Id.* at 14.

The ALJ found that Scott's nonexertional limitations were due to his crack cocaine usage. *Id.* He ultimately found that Scott's substance use had contributed to his current disability and that the cessation of such use would render him able-bodied again. *Id.* at 27. Although the ALJ found that Scott could no longer perform past relevant work, which includes food preparation and valet services, *id.* at 19, and that "there are no jobs that exist in significant numbers in the national economy that [Scott] can perform," *id.*, he stated that if Scott ceased his substance use, he could perform less than the full range of light work with minimal restrictions, including his past work as a food preparer or valet. *Id.* at 20-21, 26. While the ALJ noted the impact that Scott's substance use had on his existing impairments, he acknowledged that even were Scott to cease using drugs, his remaining limitations would still constitute a severe impairment, or combination of impairments, and would hamper his ability to perform basic work, but that those impairments would still not equal an impairment listed in 20 CFR 416.920(d). *Id.* at 20.

## C.    Plaintiff's Request for Review by Appeals Council

On February 2, 2010, and later on February 10, 2010, Scott filed a request for review to the Appeals Council of the ALJ decision denying him disability benefits. A. R. at 155, 159 ("Appeal Request"). The Appeals Council denied review on October 19, 2010.

12

# III. DISCUSSION

## A.   Standard for Judicial Review

A reviewing court does not determine *de novo* whether a claimant is disabled. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir 1996) (citing *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984)). Rather, the court's inquiry is limited to the question of whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such evidence is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citing *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). When a reviewing court concludes that the SSA applied the incorrect legal standard, the SSA's decision should be reversed. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record or to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the court determines that the correct legal standard has been applied, and the Commissioner's finding is supported by substantial evidence, the reviewing court shall deem the Commissioner's findings of fact conclusive and affirm the decision. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citations omitted). Substantial evidence in this context is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "[T]o determine whether the findings are supported by substantial evidence, the reviewing court is required to

13

examine the administrative record, including contradictory evidence and evidence from which

conflicting inferences can be drawn." *Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir. 1999) (quoting

*Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir. 1983) (*per curiam*)).  New evidence that is

submitted to the Appeals Council becomes part of the administrative record for judicial review

when the Appeals Council denies review of the ALJ's decision, provided the evidence is new

and material and relates to the period before the ALJ's decision.  *Perez v. Chater*, 77 F.3d 41, 45

(2d Cir. 1996).

**B.     Evaluation of Disability Claims**

Under the Act, every individual who is considered to have a "disability" is entitled to

disability insurance benefits.  42 U.S.C. § 423(a)(1).  Disability is defined as an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than twelve months."  42 U.S.C.

§ 423(d)(1)(A).  The disability must be of "such severity that [the claimant] is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy."  42 U.S.C.

§ 423(d)(2)(A).

To determine whether an individual is entitled to disability benefits, the Commissioner is

required to conduct the following five-step inquiry: (1) determine whether the claimant is

engaged in any substantial gainful activity; (2) if so, determine whether the claimant has a

"severe impairment" which significantly limits his ability to work; (3) if so, determine whether

the impairment is one of the conditions for which the Commissioner presumes disability; (4) if

not, determine whether the claimant is able to perform his past work despite the disability; and

14

(5) if not, determine whether the claimant can perform other work. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

The Commissioner must assess the claimant's residual functional capacity ("RFC") to apply the fourth and fifth steps of the inquiry to the claimant. A claimant's RFC represents the most that claimant can do despite limitations caused by his impairments and related symptoms. 20 C.F.R. § 404.1545(a). The Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background. *Mongeur*, 722 F.2d at 1037 (citing *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980); *Rivera v. Harris*, 623 F.2d 212, 216 (2d Cir. 1980); *Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir. 1978)); 20 C.F.R. § 404.1526(b). To properly evaluate a claimant's RFC, the ALJ must assess the claimant's exertional capabilities, addressing his ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. §§ 404.1545(b), 404.1569(a). The ALJ must also evaluate the claimant's nonexertional limitations, including depression, nervousness, and anxiety. 20 C.F.R. §§ 404.1545(b), 404.1569(a).

The claimant bears the burden of proving the first four steps, while the burden of proving the fifth is on the Commissioner. *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll v. Sec'y of Dep't of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). In making the fifth-step determination of whether there is any other work claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (quoting *Carroll*, 705 F.2d at 642).

15

C.     **The Treating Physician Rule**

The report of a claimant's treating physician is generally given more weight than other reports and will be controlling if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). When the treating physician's opinion is not given controlling weight, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include: (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(2)(i-ii) & (d)(3-6). The ALJ is required to explain the weight he or she ultimately gives to the opinions of a treating physician. *See* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *see also Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). The ALJ is not permitted to arbitrarily substitute his own judgment or view of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

16

**D.   Issues on Appeal**

Scott claims that the ALJ's findings were not supported by substantial evidence and should be reversed and/or remanded to another ALJ. A. R.. at 155. According to Scott, the ALJ wrongly concluded that his past substance use was a "contributing factor material" to his disability determination. Scott claims that he had been abstinent with regard to substance use since February 2009, and that neither Dr. Thenor nor Dr. Rameshwar's evaluations mentioned substance use was not significant since both of them were aware of his use and Dr. Rameshwar's examination occurred after Scott's period of abstinence began. *Id.* at 156. Instead, Dr. Thenor's report diagnosed Scott's disability as exclusively related to his diabetes and did not state that his symptoms were the result of substance use, rendering his purported use immaterial as to his disability diagnosis. *Id.*

Ultimately, Scott alleges that the ALJ failed to accord proper weight to the opinion of his attending physician, Dr. Thenor, committing reversible error under 20 C.F.R. § 404.1527. The failure to do so impaired the ALJ's ability to properly assess how Scott's impairments affect his ability to work in accordance with 20 §§ C.F.R. §§ 404.1513(d), 416.913(d) and SSR 96-09p. *Id.* Scott argues that the ALJ also erroneously claimed that Colby's opinion, dated October 14, 2009, was rendered outside the adjudication period, but that the assessment period began on May 22, 2008, and his hearing was on December 2, 2009. A. R. 11. The exclusion of Colby's opinion undermined the ALJ's conclusion because that opinion, rendered by a registered physician assistant who had treated Scott, shows "the severity of [Scott's] impairment(s) and how it affects [his] ability to work." *Id., referencing* 20 C.F.R. §§ 404.1513(d), 416.913(d) and SSR 96-03p (allowing for evidence from sources other than doctors to be considered). Scott maintains that the ALJ compounded his error by over-relying on the opinions of Dr. Revan and

17

Dr. Boukagov, each of whom saw Scott only once. Even Dr. Boukagov, however, stated that Scott's drug use had negligible impact on his symptoms. *Id.* at 13. Finally, the evaluations by Drs. Revan and Boukagov were conducted prior to those by Scott's treating physician, Dr. Rameshwar, and prior to his entering the period of abstinence.

**1. Scott's treating physicians were aware of his substance use and found him disabled despite, not because, of it.**

Under 20 C.F.R. § 404.1535, the Social Security Administration will consider evidence of drug and alcohol use to the extent that it is a contributing factor material to a disability determination. The ALJ must assess whether the applicant's current physical and/or mental limitations would exist if the drug use ceased. If so, then the drug use is considered to be a contributing factor. If not, then an applicant is adjudicated disabled independent of their use. The plaintiff bears the burden of demonstrating that substance abuse is not a contributing factor. *Doughty v. Apfel*, 245 F.3d 1274, 1281 (2d Cir. 2001).

Scott's treating physicians, Dr. Thenor and Dr. Rameshwar, saw him repeatedly over various six-month periods between 2008-2009 to treat him for a number of ailments, including diabetes, peripheral neuropathy, hyperlipidemia and depression. Pl's Mot. 9; A. R. at 286. Drs. Revan and Bougakov observed Scott one time each prior to his period of abstinence from drug use. The report issued by Dr. Rameshwar assessing Scott's physical and mental condition was conducted after Scott began abstaining from substance use. Additionally, both Dr. Thenor and Dr. Rameshwar were "abundantly aware" of Scott's past drug use. Pl.'s Mot. for Judgment on the Pleadings 23 ("Pl's Mot.").

**a. After six months of continuous observation in 2008, Dr. Thenor found Scott physically disabled.**

Dr. Thenor completed a residual functional capacity assessment on December 3, 2008, to

18

evaluate Scott's capacity for working.  A. R. at 286.  She concluded that Scott's conditions were chronic and permanent, in accordance with 20 C.F.R. § 404.1505.  Dr. Thenor found that Scott's symptoms included "fatigue, difficulty walking, excessive thirst, general malaise, muscle weakness, extremity pain and numbness, frequent urination, difficultly thinking/concentrating, and episodes of hyperglycemia." Pl's Mot. 9. Periodically, Scott appeared to walk with the assistance of a cane.  Id.  In Dr. Thenor's report, she noted that Scott's pain interfered with his ability to concentrate on even simple tasks.  A. R. at 288.  His limited mobility—walking for less than two hours at a time, standing for only fifteen minutes at a time, and sitting for forty-five minutes at a time—meant that Scott is only capable of low stress work.  Id. at 288-89. Ultimately, Dr. Thenor concluded that Scott had limited work capabilities cause he "ha[d] severe and painful neuropathy . . . [which was] unpredictable and not controlled." Id. at 290.

> **b.**    **After six months of continuing observation in 2009, Dr. Rameshwar found Scott psychologically disabled.**

Dr. Rameshwar completed a psychological evaluation of Scott over a six-month period from May 19, 2009, to November 20, 2009. His report on May 19, 2009, includes a list of past medical history, a family history, and a social history, all of which mentioned Scott's past cocaine use. A. R. at 321.  In fact, Dr. Rameshwar diagnosed Scott with cocaine dependence. At the time of his psychological evaluation with Dr. Rameshwar, Scott reported his last cocaine use had been in January 2009.  He complained to Dr. Rameshwar of depression, decreased energy, and difficulty falling asleep.  Apparently because Scott also indicated that he had run out of depression medication, Pl's Mot. 7, Defendant suggests that Scott's mental conditions could have been a result of not having taken his medication in the week before his examination. Def's Mot. 23.  This is sheer speculation, unsupported by medical evidence, and ignores the fact that

19

Scott's depression was not just a recent occurrence.  He had reported suicidal thoughts as early

as age fifteen or sixteen and had been hospitalized in 2008 for his depression.  A. R. at 321.  Dr.

Rameshwar's residual functional capacity assessment on November 20, 2009, though undated on

the actual assessment, noted that Scott has moderate to severe limitations in his interactions with

others and his ability to perform repetitive and varied tasks.  Pl's Mot. 10.  While his ability to

perform simple tasks was only mildly impaired, his depressed state was influenced by his

perpetual medical illnesses.

     ALJ Nisnewitz stated in his decision that he only accorded some weight to the opinions

of Dr. Thenor and Dr. Rameshwar, rather than controlling weight, because their opinions were

not supported by objective evidence and were inconsistent with the record.  The ALJ claims that

he accorded less weight to Scott's treating physicians because their reports did not take into

account his substance abuse, "which materially affects the claimant's disability and has the

effect of undermining the reliability of the opinions of the treating physicians."  A. R. at 18.

     Under 20 C.F.R. § 404.1527(d)(2), the treating physician's opinion is entitled to

controlling weight.  However, "[e]ven if the above-listed factors have not established that the

treating physician's opinion should be given controlling weight, it is still entitled to deference,

and should not be disregarded." *Tomasello v. Astrue*, 2011 WL 2516505, *3 (W.D.N.Y. June

23, 2011).  The "treating physician's opinion [is] binding unless contradicted by substantial

evidence, and even if contradicted, [is] entitled to extra weight." *Schisler v. Sullivan*, 3 F.3d 563,

565 (2d Cir. 1993).

2.     **The ALJ erred in failing to give controlling weight to the opinions of the treating physicians.**

      a.     **The opinions were supported by substantial evidence in the record.**

The opinions of Scott's treating physicians are well supported, and result from six months of continuous observation, treatment, examination and diagnostic testing.  The doctors are specialists in their respective areas of evaluation and their opinions are consistent with the record as a whole.  Scott's June 2008 visit to Montefiore hospital stemmed from various ailments, and while he was there the physician's report noted that he had "gangrenous toes."  A. R. at 211, 232.  During Scott's February 2009 visit to Bronx Lebanon hospital, he was unable to complete the stress test "because of leg pain and ulcer."  A. R. at 306.

Over the years, Scott has complained repeatedly about neuropathic pain in his hands and feet, and sometimes in his back.  During the six month period that he was visiting Damian Health Care Facility, he complained of neuropathic pain, in addition to chest pains, at each of the six visits.  Pl's Mot. 7-8.  His complaints of angina worsened during his last couple of visits, and from November 14-16, 2009 he was hospitalized at Jamaica Hospital for chest pains, palpitations, dizziness and shortness of breath.  *Id.*; A. R. at 348.

The ALJ supports his conclusion by reference to elements in reports by Dr. Revon and Dr. Bougakov, and to a lesser extent, T. Harding.  Specifically, Dr. Revan reported on July 23, 2008, that Scott had only mild limitations related to neuropathy.  Pl's Mot. 10-11.  Dr. Bougakov suggested a similar conclusion in his August 13, 2008, report based on a psychiatric examination, although he did state that Scott was limited in his ability to perform complex tasks, to keep a regular schedule, handle stress and learn new tasks.  *Id.* at 12.  New York State Division of Disability Determinations non-examining psychologist, T. Harding, opined in his

report on September 24, 2008, that because of Scott's adjustment disorder with depressed mood and substance abuse (in remission), he had moderate limitations in concentrating, maintaining a regular schedule without supervision. A. R. at 282. The ALJ also noted that the electromyography (EMG) testing on February 6, 2007, showed that Scott had only "very mild sensory axonal neuropathy." A. R. at 190. Finally, and without any medical support, the ALJ concluded that Scott's substance use contributed greatly to his impairments and that cessation of such use would render him non-disabled under the Act. A. R. at 20.

The conclusions by Drs. Revan and Bougakov, however, should not have been accorded the significance attributed to them by the ALJ. First, neither appear to be a specialist, but happened to be the duty person during on emergency or clinical visit. Second, both saw Scott only once and were not able to observe his disabilities over time. It is not clear whether the person identified as I. Blood is a medical consultant, or even a doctor. *See* Pl's Mot. 19; A. R. at 61, 276. In sum, these one-shot, limited examinations fail to provide a basis for disregarding the observations and opinions of the treating physicians. The ALJ compounded his error by seeking to introduce a new theory, not put forth by any of the doctors, that is, that Scott's real problem was drug abuse, and that if he could remove the drugs as an impediment, he would have the residual functional capacity to perform just under the full range of light work.

There is, however, nothing in the ALJ's decision – or the medical evidence – which suggests that Scott's diabetic neuropathy is contributed to, or caused, by his periodic drug use. Scott admitted to such use as a means of controlling the pain experienced as a result of his already existing condition, that is, the drug use may have resulted from the disability, not vice versa. The ALJ points to the record to support his conclusion that Scott's impairments were causally linked to his substance abuse. Presumably, one would find conclusive evidence by

22

medical personnel or tests that Scott's impairments stemmed from his substance abuse, however there is none evident in the record.  However, the ALJ does not reference any reports or evaluations that identify or even suggest drug use as a causative factor.  *See Mitchell v. Astrue*, 2009 WL 3096717, *18 (S.D.N.Y. Sept. 28, 2009) (finding "a distinct lack of evidence to support the ALJ's finding" that claimant's substance use was linked to his separate diagnosis of a mental disorder.); *see also Boyd v. Astrue*, 2009 WL 3202364, * 1 (D. Conn., September 17, 2009) (holding the ALJ's determination that plaintiff's substance abuse was a contributing factor to the denial of his disability adjudication was not supported by substantial evidence in the record.)

While the Commissioner argues that the EMG test was conclusive, the report actually indicates that Scott declined the EMG portion of the examination.  A. R. at 190.  Defendants do not dispute this.  *See* Def's Mot. 18.  Because of Scott's refusal to go forward with the EMG portion, the report of Dr. Eugene Pak states that, "one cannot rule out multiple radiculopathies and some other abnormalities due to the fact that the patient declined the needle EMG portion of the examination." *Id.*  The ALJ's decision states that Scott has "nonexertional limitations caused by his crack, cocaine, and opiate addictions which exacerbate his pain and interfere with his ability to make appropriate decision and maintain a regular schedule." A. R. at 14.  Based on this personal theory, the ALJ concluded that although cessation of substance use would not alter Scott's severe impairments, he would not have an impairment that "meets or medically equals any of the impairments" in the Act. *Id.* at 20.  In the absence of any medical evidence, the ALJ recites Scott's history of substance abuse and appears to draw his own medical conclusion that Scott's impairments are the result of such abuse.  The ALJ is not permitted such latitude to make diagnostic inferences.  His choice to do so constituted clear legal error.

23

The Commissioner seeks to address this defect by pointing to one sentence in the medical record at St. Luke's Hospital on February 7, 2007, which stated "the psychiatrist noted that it was difficulty [sic] to assess what component of plaintiff's complaints were due to neuropathy, and what component was due to drug addition seeking behavior." Def's Mot. for Judgment on the Pleadings 5 ("Def's Mot."); A. R. at 188. The Commissioner reads too much into the statement. Nowhere does the psychiatrist conclude that there is a causal connection between Scott's substance abuse and his impairments. In *Mitchell*, the Court found that the ALJ's reliance on the report of a consulting psychiatrist was misplaced when he automatically assumed the plaintiff's limitations were due to his mental impairments and daily cocaine use combined and failed to test plaintiff during a period of sobriety. *Id.* at 189. There are no conclusory statements made by medical personnel regarding the causal relationship between Scott's substance use and his impairments. Despite this lack of connection, the ALJ arrived at a determination that Scott's limitations stemming from his diabetic neuropathy, depression and angina were *all* linked to his substance abuse. The ALJ cannot assume such a connection and any conclusions drawn would not be supported by the record.

### b.    The reasons given by the ALJ for not affording the opinions the proper weight are meritless.

Defendant argues that the treating physician rule is not applicable here because the treating physicians' opinions are contradicted by substantial evidence from the consultative physicians. *See Gonzalez v. Chater*, 1996 WL 442798, *5 (S.D.N.Y., August 6, 1996); Def's Mot. 20. This position is meritless.

Based on a review of the administrative record, there are no additional factors that it appears the ALJ considered in according less weight to Dr. Thenor and Dr. Rameshwar's

24

medical opinions. 20 C.F.R. §§ 404.1527(d)(2)(i-ii) & (d)(3-6). In fact, the only other evidence

to be considered under 20 C.F.R. § 404.1513(d)(1) was evidence that the ALJ dismissed the

testimony of registered physician assistant, Heather Colby, whose statements actually *support*

Dr. Thenor and Dr. Rameshwar's evaluations of Scott and were made well within the

adjudication period. *See* A. R. at 313. While Defendants admit that the ALJ mistakenly

concluded that Colby's report was not within the adjudication period, they argue that he did not

dismiss her opinion. Def. Mot. 20. In fact, the ALJ's report states that he "accord[ed} no weight

to the opinion" of Colby. A. R. at 28.

In the past, ALJ Nisnewitz has been chided by the Court for his misplaced reliance on a

disability adjudicator's opinion instead of medical evidence. *Beckles v. Barnhart*, 340 F.Supp.

2d 285, 290 (E.D.N.Y. 2004); *Aas v. Astrue*, 2010 WL 3924687, *11 (E.D.N.Y. Sept. 29, 2010).

As in *Beckles* where the Court found that ALJ Nisnewitz improperly afforded greater weight to

the consulting physicians' opinions instead of the proper weight that was to be given the

plaintiff's treating physicians, *id.* at 289, the Court cannot derive from the record why the

medical assessments conducted by Scott's treating physicians should not be accorded their

proper weight.

### E.   Remedy

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse

the ALJ's decision with or without remanding for a rehearing. Remand for additional fact

development may be appropriate if "there are gaps in the administrative record or the ALJ has

applied an improper legal standard." *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999). In

this case, the ALJ committed a legal error when he failed to fully consider whether Scott's

history of substance use was a contributing factor material to the determination of disability and

for rejecting Scott's treating physician's opinions. The Court therefore cannot apply the substantial evidence standard. The case must be remanded for the ALJ to fully explain his reasoning for finding that Scott's limitations related to his neuropathy - which present the most serious and consistent sources of complaints - are the direct result of his substance use.

## IV. CONCLUSION

For the foregoing reasons, I recommend that the Commissioner's motion for judgment on the pleadings be **DENIED**, Scott's motion be **GRANTED**, and that the case be **REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) to

A.    Comprehensively reconsider Scott's case;

B.    Comprehensively consider a determination of disability that accords proper weight to Scott's treating physicians and evaluates whether his limitations stemming from diabetic neuropathy, angina and depression are contributed to in a material way by his history of substance use;

C.    Explain the weight given to Dr. Revan and Dr. Bougavkov's opinions considering the lack of EMG testing in accordance with 20 C.F.R. § 404.1527(d)(2); and

D.    Comprehensively reconsider Scott's subjective complaints in light of Dr. Thenor and Dr. Rameshwar's testimony,

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable John G. Koeltl, 500 Pearl Street, Room 1030, and to the chambers of the undersigned, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in

the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn*,

474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir.

1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(d).

**DATED: March 14, 2012**
**New York, New York**

Respectfully Submitted,

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**

Copies of this Report and Recommendation were sent to:

COUNSEL FOR THE PLAINTIFF
Christopher James Bowes
CHRISTOPHER JAMES BOWES, ESQ.
54 Cobblestone Drive
Shoreham, NY 11786

COUNSEL FOR THE DEFENDANT
Leslie A. Ramirez-Fisher
United States Attorney's Office
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007

27